UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

IVY L. REEVES,

                                    Plaintiff,

         -v-

CITY OF YONKERS,

                                    Defendant.

No. 16-CV-2223 (KMK)

<u>OPINION & ORDER</u>

<u>Appearances:</u>

Ivy L. Reeves
Yonkers, NY
*Pro Se Plaintiff*

Hina Sherwani, Esq.
Gregory S. Spicer, Esq.
Matthew I. Gallagher, Esq.
Corporation Counsel for the City of Yonkers
Yonkers, NY
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

        Pro se Plaintiff Ivy L. Reeves ("Plaintiff") brings this Action against the City of Yonkers ("Defendant") pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112 *et seq.*, and Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. § 2000e *et seq.*, alleging that she was "terminated [from her job with Defendant for] using compensation time for medical appointments and procedures," while certain employees of Defendant believed she was in fact "running for office and taking time off for campaigning." (Compl. 5.) Before the Court is Defendant's Motion for Summary Judgment. (Not. of Mot. (Dkt. No. 63).) For the following reasons, the Motion is granted.

## I. Background

## A. Factual Background

The following facts are taken from Defendant's statement pursuant to Local Civil Rule 56.1, (Def.'s Rule 56.1 Statement ("Def.'s 56.1") (Dkt. No. 66)); Plaintiff's response to that statement, (Pl.'s Resp. to Def.'s 56.1 Statement ("Pl.'s 56.1") (Dkt. No. 68, at 1–3)), and accompanying documents, (Pl.'s Resp. to Def.'s Mot. ("Pl.'s Mem.") (Dkt. No. 68, at 4–119))[1]; and the admissible evidence submitted by the Parties, (Decl. of Dusan Lakic, Esq. in Supp. of Mot. & Exs. A–H ("Def.'s Decl.") (Dkt. No. 64)).  The facts are recounted "in the light most favorable to" Plaintiff, the non-movant.  *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018) (internal quotation marks omitted).[2]  The facts as described below are in dispute only to the extent indicated.[3]

---

[1] Plaintiff has not separated her 56.1 statement, (*see* Dkt. No. 68, at 1–3), from the other documents submitted in opposition to the Motion for Summary Judgment, (*see id.* at 4–119).  For ease of reference, the Court cites to the ECF-generated page numbers stamped at the top right corner of the page and, where applicable, the relevant paragraph number.

[2] Local Civil Rule 56.1(a) requires the moving party to submit a "short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  The nonmoving party must then submit "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short[,] and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."  Local Civ. R. 56.1(b).  "If the opposing party . . . fails to controvert a fact set forth in the movant's Rule 56.1 statement, that fact will be deemed admitted pursuant to the local rule."  *Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) (internal quotation marks omitted); *see also T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) (same).

[3] Where the Parties identify disputed facts but with semantic objections only or by asserting irrelevant facts, these purported disputes, which do not actually challenge the factual substance described in the relevant paragraphs, the Court will not consider them as creating disputes of fact.  *See Baity*, 51 F. Supp. 3d at 418 ("Many of [the] [p]laintiff's purported denials — and a number of his admissions — improperly interject arguments and/or immaterial facts in response to facts asserted by [the] [d]efendants, often speaking past [the] [d]efendants' asserted facts without specifically controverting those same facts. . .  [A] number of [the] [p]laintiffs'

### 1. Plaintiff's Employment

Plaintiff was hired by Defendant, through Yonkers' Office of the City Councilman for the Third District, Michael Sabatino ("Sabatino"), in early January 2012. (Def.'s 56.1 ¶ 1; Pl.'s 56.1 ¶ 1; Def.'s Decl. Ex. C ("Pl.'s Dep.") 6–7, 11–12.) At hiring, Plaintiff's title was "Aide to the City Council II," a "confidential clerical" position that required her to, among other things, "assist[] in preparing and tracking legislation" and "resolutions," assist in "the answering of inquiries and complaints from the general public," "[o]versee[] the requisitions and receipts of . . . equipment for the department," "receive visitors . . . [,] including salesmen, the press, government and industry officials and the general public," and attend public events. (Def.'s Decl. Ex. F, at 10 (job description); *see also* Def.'s 56.1 ¶ 2; Def.'s Decl. Ex. D ("Sabatino Dep.") 16, 37 (Dkt. No. 64).)[4] In January 2014, Plaintiff was promoted to "Aide to the City

---

purported denials quibble with [the] [d]efendants' phraseology, but do not address the factual substance asserted by [the] [d]efendants."); *Pape v. Bd. of Educ. of Wappingers Cent. Sch. Dist.*, No. 07-CV-8828, 2013 WL 3929630, at *1 n.2 (S.D.N.Y. July 30, 2013) (explaining that the plaintiff's 56.1 statement violated the rule because it "improperly interjects arguments and/or immaterial facts in response to facts asserted by [the] [d]efendant, without specifically controverting those facts," and "[i]n other instances, . . . neither admits nor denies a particular fact, but instead responds with equivocal statements"); *Goldstick v. The Hartford, Inc.*, No. 00-CV-8577, 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002) (noting that the plaintiff's 56.1 statement "does not comply with the rule" because "it adds argumentative and often lengthy narrative in almost every case[,] the object of which is to 'spin' the impact of the admissions [the] plaintiff has been compelled to make").

In some instances, the Parties identify actual disputes of fact but fail to cite the supporting portions of the record; this also could permit the Court to deem the challenged facts undisputed. *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (explaining that the court is not required to search the record for genuine issues of material fact that the party opposing summary judgment failed to bring to the court's attention); *Baity*, 51 F. Supp. 3d at 418 (collecting cases for the proposition that "responses that do not point to any evidence in the record that may create a genuine issue of material fact do not function as denials, and will be deemed admissions of the stated fact." (alteration and internal quotation marks omitted)).

[4] Plaintiff states that she "does not recall receiving a job description" from Defendant. (Pl.'s 56.1 ¶ 2.)

Council III," a "highly confidential complex clerical" position "requiring the use of independent judgment in highly varied but routine matters." (Def.'s Decl. Ex. F, at 11 (job description).) In particular, the position required "[w]elcom[ing] dignitaries and other officials," "[p]repar[ing] and maintain[ing] all time, attendance[,] and payroll records," the "[a]bility to supervise the work of others," and a "[h]igh degree of discretion," in addition to completing the duties of Aide to the City Council II. (*Id.*; *see also* Def.'s 56.1 ¶ 3–4; Pl.'s Dep. 11; Sabatino Dep. 13, 17, 35–38.)[5]

In practice, Plaintiff spent much of her time on "constituent services," that is, answering inquiries and complaints from the public. (Pl.'s Dep. 18–21.) Plaintiff also proofread Sabatino's press releases, (*id.* at 21), and created and produced events for him, including a show on "different issues that concerned Black Americans," (*id.* at 26). Finally, Plaintiff attended numerous community and precinct meetings, ribbon cuttings, construction groundbreakings, and other public events on behalf of Sabatino, where she would listen to community concerns, take pictures and notes, and report back to Sabatino. (*Id.* at 10–14, 28.) Plaintiff served, in other words, as Sabatino's "eyes and ears in the community" when "he couldn't make it" to public events. (*Id.* at 12.)

### 2. Plaintiff's Candidacy

Between 2014 and 2017, Sabatino served as minority leader of the Yonkers City Council and head of the Council's Democratic Caucus. (Sabatino Dep. 21–22, 34.) Christopher Johnson ("Johnson"), Yonkers City Councilman for the First District, served as another member of the Democratic Caucus. (*Id.* at 44; *see also* Def.'s 56.1 ¶ 5.) In May 2015, as Sabatino and Johnson were campaigning for re-election in their respective districts, (Def.'s 56.1 ¶ 6), Sabatino heard

---

[5] Plaintiff states that she "does not recall receiving description of new responsibilities" from Defendant. (Pl.'s 56.1 ¶ 4.)

from members of a local political organization that Plaintiff had begun a political campaign to challenge Johnson, (*id.* ¶ 7). Sabatino further heard that Plaintiff was running on a "political ticket" — the "Yonkers Women's Ticket" — alongside a woman challenging Sabatino. (Sabatino Dep. 39–41; *see also* Def.'s 56.1 ¶ 8.) Also that month, multiple local newspaper articles were published describing Plaintiff as running for office and doing so as part of a political ticket. (Def.'s Decl. Ex. G, at 3–8, 13–14; *see also* Def.'s 56.1 ¶¶ 9–10, 13.) And on May 23, 2015, Nicole Benjamin, herself running for local political office, sent an email stating that she was "running on the Yonkers Women's Ticket," which was comprised of "four female candidates" including "Ivy Reeves for the First Council District." (Def.'s Decl. Ex. G, at 2–3; *see also* Def.'s 56.1 ¶ 11.)

It is undisputed that Plaintiff was running for office in May 2015. In fact, in a May 25, 2015 email to colleagues, Plaintiff stated, "I am running for the first district [against Johnson] as I did 4 years ago." (Def.'s Decl. Ex. G, at 9.)[6] However, Plaintiff denies that she was a member of a political ticket. (Pl.'s 56.1 ¶ 5; Pl.'s Mem. 16 ¶ 11.) Plaintiff states that she was not aware of any newspaper articles or emails describing her as on a ticket. (Pl.'s Dep. 55–58, 67, 93–94.) Indeed, Plaintiff told her colleagues in her May 25, 2015 email that:

> Unfortunately [Sabatino] is being challenged by one of his constituents. I recently found out about this and just want you all to know I had absolutely NOTHING to do with the woman running and I have told her I cannot support her run against [Sabatino]. . . . So once again I apologize to those of you who have been pulled

---

[6] In her deposition, Plaintiff first stated that she did not decide to run for office until "[a]fter [she] knew Michael [Sabatino] was going to fire [her]; in June" 2015. (Pl.'s Dep. 50.) Plaintiff later stated that she made up her mind to run in "June, the first of June, probably the end of May, approximately, because once all of this started happening I was like okay." (*Id.* at 54.) When asked to clarify, Plaintiff stated: "When [Sabatino] started seeing things in the newspaper after I finished doing an event . . . , when I [got] home he texted me about this Nicole being at a meeting and evidently I must have announced because she told someone at the meeting . . . and I said I had nothing to do with that." (*Id.* at 54–55.) Plaintiff ultimately conceded that she decided to run in late May 2015. (*Id.* at 61–63.)

into this very uncomfortable situation. I have always considered [Sabatino] a friend and [am] not supporting anyone against him. . . . Please understand I have no control over what other people feel, think, do[,] or say.

(Def.'s Decl. Ex. G, at 9–10.)[7]  A post shared on Plaintiff's Facebook page, however, represents her as a member of a political ticket. (*Id.* at 11–12; *see also* Pl.'s Dep. 64–65.)

Sometime in May 2015, Sabatino spoke to Plaintiff and informed her that her campaign for office "was a major conflict of interest because Councilman Sabatino was the Minority Leader of the City Council." (Def.'s 56.1 ¶ 14; *see also* Sabatino Dep. 43–45, 59.)

### 3. Plaintiff's Leave Request

On June 1, 2015, Plaintiff submitted to Defendant a request for leave from June 2, 2015 to July 7, 2015, for medical reasons. (Def.'s Decl. Ex. A, at 11 (completed leave request form); *see also* Def.'s 56.1 ¶ 15; Pl.'s Mem. 15 ¶ 1; Pl.'s 56.1 ¶ 15.)  Plaintiff has testified that she was experiencing emotional stress and anxiety, heart irregularities, and joint problems, and that she was on medication to treat those issues. (Pl.'s Dep. 30–35.)  Sabatino has testified that he was aware that Plaintiff suffered from various medical conditions, including lupus and digestive issues. (Sabatino Dep. 73–74, 93.)  Upon receiving Plaintiff's leave request, Sabatino — who as described above, had heard of Plaintiff's candidacy in May 2015 and who doubted that Plaintiff had a medical reason for her leave request, (*id.* 84–85) — sent Plaintiff two emails.  The first, sent at about 8:00 p.m. on June 1, 2015, requested that Plaintiff meet with Sabatino the next day,

---

[7] Plaintiff additionally provides an affidavit from Tarshiena Diaz, the candidate who challenged Sabatino in the Third District. (Pl.'s Mem. 83.)  Diaz states that Plaintiff "let me know that she was both a friend and co-worker of [Sabatino]" and that "she would not be able to support me because Mr. Sabatino was her friend and she would be there for him in his run for the third district seat.  She went on to make it clear that she would not be able to get signatures or tell others to vote for me, because Mr. Sabatino would need her support." (*Id.*)

at 3:00 p.m., to discuss "moving beyond the current situation."  (Pl.'s Mem. 93; *see also* Def.'s

56.1 ¶ 16.)  The second, sent later that night, stated:

> I am in receipt of your request for comp time.  One of the reasons for the meeting
> is to discuss your request for comp time and to work on a resolution regarding the
> last week and a half.  According to the comp time policy, compensatory time shall
> NOT be used for political activities such as petitioning, campaigning,
> electioneering, and etcetera.  I have attached the policy.  We have to discuss some
> alternative options.  My expectation is that you will be at work tomorrow and we
> will meet at 3 pm.

(Pl.'s Mem. 93.)

Plaintiff states that she had scheduled a doctor's appointment for "around" 3:15 p.m. on

June 2, 2015, at about the same time as the meeting requested by Sabatino.  (Pl.'s 56.1 ¶ 16.)[8]

Early in the morning on June 2, Plaintiff responded to Sabatino via email, stating in relevant part:

> I have taken time off to take care of myself.  I am going to see a doctor tomorrow
> and my health comes first.  There are medical needs I have to address.  This is the
> first time I'm hearing about this meeting.  I'm very sorry but you had plenty of time
> to speak with me and now that I put in time to take off you have an urgency to see
> me.  Then I was informed after putting in my time that you think it is for
> campaigning.  Campaigning is done after work not during work.  I left because of
> the hostile work environment of you not wanting me in the office during the
> campaign. . . .  I need to see my doctor because my heart has been very irregular
> since last week.

(Def.'s Decl. Ex. A, at 19; *see also* Pl.'s Dep. 41–42.)  Plaintiff then followed up with a second

email, stating in relevant part:

> You wanted me out of the office according to all of the people you spoke to about
> me.  So I decided to take my time as other aide[s] have done . . . .  Please remember
> I had no problem doing my job or being in [the] office, but [y]ou caused tension
> and the other workers could see how you were treating me.  You were unable to
> hide your hostility and that was a shame.  You are concerned about the timing which
> I had nothing to do with.  I see that you are continuing to disrespect me.  I never
> said I was using my time to campaign.  When I ran 2 years ago for city council
> president I worked and took some vacation.  There was no problem then.  Now . . .
> you are consumed with your assumption that I took off for campaigning.  Clearly

---

[8] Plaintiff has not provided documentation as to when the doctor's appointment was
scheduled.  (*See* Pl.'s Mem. 94.)

you are letting me know that you couldn't care less about my health only what seems to be a life or death matter to you in this political arena . . . . So bottom line today I will be taking care of someone I have neglected over the last year . . . . I have taken time off most of my adult working life for my birthday. . . . Perhaps you could use your power and tell the Democratic Party to change the month and week of the month so that peti[ti]oning does not fall on the first of June.

(Def.'s Decl. Ex. A, at 19.)  Sabatino responded to Plaintiff by email:

I have to say I whole heartedly disagree . . . regarding the office atmosphere and my actions.  I look forward to meeting with [you] as soon as possible to address these issues.  That being said I hope all goes well with the [d]octor.  I will mark today as a sick day.

(*Id.* at 20.)

Plaintiff attended her doctor's appointment, (*see* Def.'s Decl. Ex. A, at 12–17 (documentation from doctor's visit)), and thereafter submitted to Sabatino a doctor's note stating that Plaintiff should be excused from work for two weeks — from June 2 to June 16, 2015 — for unspecified "medical reasons," (Pl.'s Mem. 95; *see also* Def.'s 56.1 ¶ 17; Pl.'s 56.1 ¶¶ 17–18; Pl.'s Dep. 35–36).[9]

### 4.  Plaintiff's Campaigning, Termination, and Post-Termination Activities

Between June 2, 2015 and July 9, 2015 — the dates corresponding to New York's period for collection of petition signatures for candidacy, (*see* Def.'s Decl. Ex. H, at 1–2; Def.'s 56.1 ¶ 18; Pl.'s Dep. 79–80) — Plaintiff witnessed 354 petition signatures for herself as candidate. (Def.'s Decl. Ex. H, at 4–39; *see also* Def.'s 56.1 ¶ 19.)[10]  Over the same period, associates of

---

[9] Plaintiff maintains that she was "was treated differently" than other staff members, who were allowed to "bring their doctors' note in once they returned back to the office," whereas Plaintiff was "asked to fax [her] note in before returning to the office."  (Pl.'s Dep. 38; *see also* Def.'s Decl. Ex. A, at 22.)

[10] Plaintiff states that, as of her termination, there were "only 74 total signatures collected and 36 were on the weekend, 8 with friends and family[,] and 13 with friends and neighbors. The other 17 possibly [were] from an evening event."  (Pl.'s 56.1 ¶ 20.)

Plaintiff witnessed some 150 such signatures. (Def.'s Decl. Ex. H, at 40–54; *see also* Def.'s 56.1 ¶¶ 20–21.) Plaintiff did not notify Sabatino that she was campaigning. (Pl.'s Dep. 90–91.) When asked why she was able to collect signatures when she also had medical issues that required her absence from work, Plaintiff stated: "[T]he doctor told me to stay out of the office, but not out of the city. So, it was the office that was causing the problems." (*Id.* at 88.)

On June 8, 2015, Sabatino informed Plaintiff by letter that he was "denying [her] request" for compensatory time and terminating her employment, effective at close of business on June 9, 2015. (Def.'s Decl. Ex. F, at 5 ("Termination Letter")); *see also* Def.'s 56.1 ¶ 22; Pl.'s 56.1 ¶ 22; Pl.'s Dep. 8, 12; Sabatino Dep. 98.) Sabatino stated:

> Based on your public statements that you intend to run for Council in the First District during the period in which you have requested compensatory time, it has become abundantly clear that you intend to use this time for political and/or campaign purposes. Such use of compensatory time is expressly prohibited by this office's policy . . . . Your candidacy . . . also creates a direct conflict of interest . . . between your status as a candidate and your role as an employee in the Office of Minority Leader. . . . In addition, . . . you are a member of a slate of candidates that includes a candidate who is running against me. While you are free to run for elected office and support whomever you wish, your actions and decision to run create a clear conflict of interest within the [O]ffice of Council Minority Leader which prevents you from carrying out the duties delineated in your job description. . . . Therefore, I must terminate you from your current position effective at the close of business on Tuesday, June 9, 2015.

(Termination Letter.) Plaintiff, for her part, maintains that "there was no conflict of interest," and that she had "informed the prospective person preparing to campaign against [Sabatino] that [she] would not support her." (Pl.'s 56.1 ¶ 23.)

Following her termination, Plaintiff authored an op-ed in *Yonkers Rising* on June 19, 2015, stating that Sabatino "terminated me as his legislative aide . . . because I decided to run again for the first district City Council seat, as I did four years ago against Christopher Johnson." (Def.'s Decl. Ex. G, at 16–17; *see also* Def.'s 56.1 ¶ 24; Pl.'s 56.1 ¶ 24; Pl.'s Dep. 69.) On June

20, 2015, the *Yonkers Tribune* published an article discussing Plaintiff's campaign against Johnson. (Def.'s Decl. Ex. G, at 18; *see also* Def.'s 56.1 ¶ 25; Pl.'s 56.1 ¶ 25; Pl.'s Dep. 70–71.)

B.  Procedural History

On March 23, 2016, Plaintiff filed her Complaint and application to proceed in forma pauperis ("IFP"). (Dkt Nos. 1, 2.) The Court granted Plaintiff's IFP application on April 4, 2016. (Dkt. No. 3.) On April 7, 2016, the Court issued an Order directing service on Defendant City of Yonkers, (Dkt. No. 5), and the City was served thereafter, (Dkt. No. 10). On July 5, 2016, Defendant filed a letter requesting a pre-motion conference in anticipation of a motion to dismiss on the ground that Plaintiff's claim was time-barred, (Dkt. Nos. 9, 12), and Plaintiff responded on July 28, 2016, (Dkt. No. 14). The Court held a pre-motion Conference on January 20, 2017. Defendant filed its Motion To Dismiss and accompanying papers on February 21, 2017. (Dkt. Nos. 22, 23, 24.) On February 23, 2017, Plaintiff filed a letter requesting a settlement conference. (Dkt. No. 26.) The Court rejected the request, saying it would first decide the Motion. (Dkt. No. 27.) On March 20, 2017, Plaintiff filed her response to Defendant's Motion. (Dkt. No. 28.) On April 19, 2017, Defendant filed its reply. (Dkt. No. 29.) On May 24, 2017, the Court issued an Opinion denying Defendant's Motion. (Dkt. No. 30.) On September 7, 2017, the Court adopted a case management plan and the case proceeded to discovery. (Dkt. No. 37.)

On June 5, 2018, Defendant filed a letter seeking a pre-motion conference indicating the grounds on which it would move for summary judgment. (Dkt. No. 54.) Plaintiff responded on June 14, 2018. (Dkt. No. 61.) On June 18, 2018, the Court adopted a briefing schedule. (Dkt. No. 57.) Defendant filed the instant Motion for Summary Judgment and supporting papers on July 31, 2018. (Not. of Mot.; Def.'s Decl.; Mem. of Law in Supp. of Mot. for Summ. J. ("Def.'s

Mem.") (Dkt. No. 65); Def.'s 56.1.)  Plaintiff filed her response on August 24, 2018.  (Pl.'s 56.1; Pl.'s Mem.)  Defendant filed its reply on September 7, 2018.  (Def.'s Reply to Pl.'s Resp. ("Def.'s Reply") (Dkt. No. 71).)

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland County Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same).  "It is the movant's burden to show that no genuine factual dispute exists."  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 521 (S.D.N.Y. 2015).

"However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and internal quotation marks omitted).  Further, "[t]o survive a [summary judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical'

possibility that his allegations were correct; [s]he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (internal quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . ."). Indeed, "[w]hile summary judgment must be granted with caution in employment discrimination actions, . . . a plaintiff must prove more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Aspilaire v. Wyeth Pharm., Inc.*, 612 F. Supp. 2d 289, 302 (S.D.N.Y. 2009) (citations and internal quotation marks omitted); *see also Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 608 (2d Cir. 2006) ("[S]ummary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact, and may be appropriate even in the fact-intensive context of discrimination cases." (citations and internal quotation marks omitted)).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (internal quotation marks omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (internal quotation marks

omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)). However, a district court should consider only evidence that would be admissible at trial. *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)).

## B. Analysis

Plaintiff alleges employment discrimination under the ADA and Title VII on the ground that Defendant improperly terminated her "while [Plaintiff was] using compensation time for medical appointments and procedures." (Compl. 1, 5.) Defendant argues that Plaintiff's ADA claim must fail for failure to make out a prima facie case of discrimination and because Defendant had a legitimate, nondiscriminatory, non-pretextual reason to terminate Plaintiff, (Def.'s Mem. 1, 3–14), and that Plaintiff's Title VII claim must fail for failure to allege discrimination on the basis of a category protected under the statute, (*id.* at 1, 14–15).

### 1. ADA Claim

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . [the] discharge of employees." 42 U.S.C. § 12112(a). To establish a prima facie claim of discrimination under the ADA on the basis of an unlawful discharge, a plaintiff must

> show by a preponderance of the evidence that: (1) [her] employer is subject to the ADA; (2) [she] was disabled within the meaning of the ADA; (3) [she] was otherwise qualified to perform the essential functions of [her] job, with or without reasonable accommodation; and (4) [she] suffered adverse employment action because of [her] disability.

*McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013) (internal quotation marks omitted). This claim is analyzed under the three-part burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973).

> Under *McDonnell Douglas*, a plaintiff bears the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination; it is then the defendant's burden to proffer a legitimate non-discriminatory reason for its actions; the final and ultimate burden is on the plaintiff to establish that the defendant's reason is in fact pretext for unlawful discrimination.

*Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 251 (2d Cir. 2014).

The Court need not determine whether Plaintiff has satisfied her burden of establishing a prima facie claim of disability discrimination under the first step of *McDonnell Douglas*. Even assuming that Plaintiff can establish a prima facie case, Defendant has, at the second step of *McDonnell Douglas*, proffered overwhelming evidence of a legitimate, nondiscriminatory reason for Plaintiff's termination: that Plaintiff's "campaign for public office created a direct conflict of interest between her status as a candidate and her role as an employee in the Office of the Minority Leader." (Def.'s Mem. 7.) Finally, Plaintiff fails, at the third step of *McDonnell Douglas*, to offer any evidence whatsoever that Defendant's reason for her termination was in fact because of her disability and thus pretextual.

### a. Termination of Public Employees on Political Grounds

The Supreme Court has held that, in general, a public employee may not be terminated on the basis of her political party or ideology. *See Rutan v. Republican Party of Ill.*, 497 U.S. 62, 64 (1990) (citing *Branti v. Finkel*, 445 U.S. 507 (1980) and *Elrod v. Burns*, 427 U.S. 347 (1976)). An exception exists, however, for "policy-making and confidential employees," who "may be discharged by reason of political affiliations, political beliefs, ideological viewpoints[,] or partisan activity," *Kaluczky v. City of White Plains*, 57 F.3d 202, 208 (2d Cir. 1995) (internal

quotation marks omitted), because "party affiliation is an appropriate requirement for the position," *Rutan*, 497 U.S. at 64. To justify a termination under this "policymaker exception," *Morin v. Tormey*, 626 F.3d 40, 44 (2d Cir. 2010), the employer bears the burden of "demonstrat[ing] that party affiliation is an appropriate requirement for the effective performance of the public office involved," *Branti*, 445 U.S. at 518. In other words, the employer must demonstrate "a rational connection between shared ideology and job performance." *Savage v. Gorski*, 850 F.2d 64, 68 (2d Cir. 1988). "This inquiry generally requires consideration of the duties of the office as set forth in the job description," *Morin*, 626 F.3d at 45 (internal citation omitted), as well as eight "non-exclusive factors":

> These are that the employee is (1) exempt from civil service protection, (2) has some technical competence or expertise, (3) controls others, (4) is authorized to speak in the name of policymakers, (5) is perceived as a policymaker by the public, (6) influences government programs, (7) has contact with elected officials, and (8) is responsive to partisan politics and political leaders.

*Id.* (citing *Vezzetti v. Pellegrini*, 22 F.3d 483, 486 (2d Cir. 1994)); *see also Butler v. N.Y. State Dep't of Law*, 211 F.3d 739, 744 (2d Cir. 2000) (noting the *Vezzetti* factors are "not exhaustive, but instead serve[] as a guide; no one factor or group of factors is always dispositive").

The first factor — whether Plaintiff is "exempt from civil service protection," *Morin*, 626 F.3d at 45 — asks whether Plaintiff's position is "covered by any statute, ordinance, or regulation protecting [her] from arbitrary discharge." *Elrod*, 427 U.S. at 350 (plurality opinion). This factor, though important, is not conclusive. *See Gordon v. County of Rockland*, 110 F.3d 886, 890 & n.5 (2d Cir. 1997) (noting that the plaintiffs "were exempt from civil service protection, which has been considered important by this circuit even before *Vezzetti*," but that "[t]his circuit does not . . . presume employees are exempt from First Amendment protection just because they are exempt from civil service protection" because doing so "would be at odds with

*Elrod*"); *Regan v. Boogertman*, 984 F.2d 577, 580 (2d Cir. 1993) ("While the Fourth Circuit has held that if a position is exempt from civil service protection one may presume that dismissal for political affiliation is permissible, we do not rely on this presumption." (internal citation omitted)).

Here, no Party points the Court to any statute, ordinance, or regulation protecting either of Plaintiff's positions — Aide to the City Council II and III — from termination. Moreover, it is undisputed that Plaintiff did not take a civil service examination upon either being hired or promoted. (Def.'s 56.1 ¶ 1; Pl.'s 56.1 ¶ 1; Pl.'s Dep. 26–27.) Plaintiff does allege that "a Civil Service Nomination Application was completed and filed" upon her hiring in November 2011, (Pl.'s Mem. 75), and additionally provides a copy of a July 2013 email noting an undefined "civil service status change" for her position as Aide to the City Council II, (*id.* at 74). Plaintiff does not, however, explain the nature of the status change. Nor does Plaintiff state whether she filed a similar Civil Service Nomination Application upon her promotion to Aide to the City Council III, the position she held at the time of her termination in June 2015. In sum, there is no evidence suggesting Plaintiff enjoyed civil service protection from arbitrary termination at the time of her termination.

The second factor — whether Plaintiff's position "has some technical competence or expertise," *Morin*, 626 F.3d at 45 — does not cut strongly in either direction. On the one hand, the Aide to the City Council III job description states that the position involves assisting "in preparing and tracking legislation," preparing and maintaining "all time, attendance[,] and payroll records," and overseeing "the requisitions and receipts of . . . equipment for the department." (Def.'s Decl. Ex. F, at 11.) The preparation and tracking of legislation often involves technical expertise on substantive policy issues, legislative procedure, and budgetary

issues.  *See Burkhardt v. Lindsay*, 811 F. Supp. 2d 632, 645 (E.D.N.Y. 2011) ("[E]ven if it is true

that legislative aides need not possess a particular type of technical expertise, such as a legal or

other advanced degree, the fact that some aides . . . possess certain types of expertise, including

on procedural and budgetary topics, indicates that technical knowledge may be considered part

of the inherent duties of the position."); *Alberti v. County of Nassau*, 393 F. Supp. 2d 151, 172

(E.D.N.Y. 2005) ("Expertise in municipal budget oversight is a strong indicator of policymaking

status." (internal quotation marks and citation omitted)).  Similarly, the preparation and

maintenance of payroll and related records could well involve some technical competence.

Therefore, some of the "inherent duties" of Plaintiff's position seem to require at least some

technical expertise.  *Vona v. County of Niagara*, 119 F.3d 201, 207 (2d Cir. 1997) ("[W]e must

focus on the inherent duties of the position to determine if there is a rational connection between

shared ideology and job performance.").  On the other hand, it does not appear that *in practice*

Plaintiff was substantively involved in the legislative process, or that Plaintiff had technical

knowledge of legislative procedural rules.  (*See* Pl.'s Dep. 16–18.)  Rather, the bulk of Plaintiff's

role centered around answering inquiries from the public and attending community and other

meetings on behalf of Sabatino.  (*Id.* at 10, 12–14, 18–21, 28.)  There is no evidence that these

functions required Plaintiff to exercise any technical competence or expertise.

Similarly, the third factor — whether Plaintiff controls others, *Morin*, 626 F.3d at 45 —

does not cut strongly in either direction.  Plaintiff's position, particularly after her promotion to

Aide to the City Council III, involved the supervision of others in the office; the job description

for that position stated that "supervision may be exercised over assigned personnel office staff"

and that the position required the "ability to supervise the work of others."  (Def.'s Decl. Ex. F,

at 11.)  The "inherent duties" of Plaintiff's position at the time of termination, then, provide for

control of others. *Vona*, 119 F.3d at 207. However, as with the second factor, Plaintiff's

position may have been vested with the ability to control, but Plaintiff herself does not seem to

have in practice exercised any significant control authority. Sabatino has testified that Plaintiff

assigned projects and coordinated some activities with other aides, (*see* Sabatino Dep. 35, 38),

but there is no record of what kinds of projects were assigned or descriptions of these projects,

how often Plaintiff delegated work, or how Plaintiff would typically coordinate with other

staffers. Nor is there evidence suggesting, for example, that Plaintiff led a dedicated team, was

responsible for or supervised a particular office program, or had any involvement in the hiring

and firing process. *Cf. Burkhardt*, 811 F. Supp. 2d at 645 (holding the plaintiff fell under the

policymaker exception in part because she "not only supervised the intern program for a number

of years, but also had supervised staff members" and "conducted interviews").

The fourth through eighth factors — whether Plaintiff was "authorized to speak in the

name" of Sabatino, was "perceived as a policymaker by the public, "influence[d] government

programs," "ha[d] contact with elected officials," and was "responsive to partisan politics and

political leaders," *Morin*, 626 F.3d at 45 — "together encompass a principle upon which [the

Second Circuit] has placed primary importance: whether the employee in question is empowered

to act and speak on behalf of a policymaker, especially an elected official." *Gordon*, 110 F.3d at

890. These factors, taken together, weigh heavily in favor of Defendant. Plaintiff was hired

directly by and worked directly for Michael Sabatino, an elected official and policymaker.

(Def.'s 56.1 ¶ 1; Pl.'s 56.1 ¶ 1; Pl.'s Dep. 11, 29.) Plaintiff acted in Sabatino's name when she

attended community and precinct council meetings, ribbon cuttings, and other public events on

his behalf. (*See* Pl.'s Dep. 10, 12–14, 28, 69.) When Plaintiff attended such meetings, there can

be little doubt that she was perceived by the public as Sabatino's representative, as she answered questions from the public on his behalf.  (*See id.* 12–14.)

To be sure, the record does not show that Plaintiff exercised substantial influence over local governmental programs or that she was closely involved in the preparation or drafting of legislation.  (*Id.* at 16–18.)  Nor is it clear whether Plaintiff had regular contact with local Yonkers elected officials other than Sabatino.  (*Id.* at 24.)  But Plaintiff acknowledges that she saw herself as Sabatino's "eyes and ears in the community" when "he couldn't make it" to public events.  (*Id.* at 12.)  *See Burkhardt*, 811 F. Supp. 2d at 648 (holding the plaintiff fell under the policymaker exception in part because she "acted as the 'eyes and ears' for the Presiding Officer at a variety of boards, commission, and committee meetings").  That Plaintiff represented Sabatino "at meetings or conferences . . . indicates that [Plaintiff] [was] in a confidential position, and that [her] position demand[ed] political affinity with those [she] represent[ed]." *Alberti*, 393 F. Supp. 2d at 170–71 (citation omitted)).  Plaintiff's position was one, in other words, "in which her public comments [at community meetings and other events] could reasonably be understood to reflect the views or, at a minimum, the sympathies of" Sabatino. *Gordon v. Griffith*, 88 F. Supp. 2d 38, 58 (E.D.N.Y. 2000).  Plaintiff's position was inherently political and not just ministerial.  *See Burkhardt*, 811 F. Supp. 2d at 646 ("Although [the] plaintiff argues that her position was inherently a ministerial one, . . . the record belies this argument and instead supports a finding that legislative aides may be empowered to act and speak on behalf of a policymaker or elected official.").  Thus, considering the fourth through eighth factors together, the Court concludes that the undisputed evidence shows that Plaintiff was "empowered to act and speak on behalf of a policymaker, especially an elected official." *Gordon*, 110 F.3d at 890.

In sum, the Court concludes that the *Morin/Vezzetti* factors weigh strongly in favor of a finding that Plaintiff held a position whose inherent duties were political, that Plaintiff actually exercised several of these inherently political duties, and, therefore, that Plaintiff's position required political alignment between herself and Councilman Sabatino. *See Regan*, 984 F.2d at 581 ("We conclude that [the plaintiff's] actions and her authority place her position in the governmental spectrum in which political allegiance is vitally important."). Defendant has, in other words, sustained its burden of demonstrating "a rational connection between shared ideology and job performance." *Savage*, 850 F.2d at 68.[11]

Because Plaintiff held a "policy-making and confidential" position, she "may be discharged by reason of . . . partisan activity." *Kaluczky*, 57 F.3d at 208. Here, the undisputed evidence shows that Plaintiff engaged in partisan activity. In May 2015, Plaintiff began preparing her campaign for the First District in Yonkers City Council. (Def.'s Decl. Ex. G, at 9; Pl.'s Dep. 61–63.) Soon after, Sabatino became aware of her candidacy. (Def.'s 56.1 ¶ 7–8; Sabatino Dep. 39.) As Defendant explains and as the record shows, "Sabatino did not approve Plaintiff . . . to campaign for office against a fellow member of that same caucus [led by Sabatino]." (Def.'s Mem. 13.) Plaintiff's political conduct "ran counter to the views of her employer" because it created a potential and actual conflict of interest with Sabatino. (*Id.*) As a candidate running against a member of Sabatino's caucus, Plaintiff "could no longer be privy to certain confidential information" in Sabatino's office. (*Id.*) Moreover, Plaintiff's candidacy may have damaged Sabatino's ability to lead the caucus. As the Second Circuit has explained:

---

[11] This conclusion is consistent with those of other courts, which regularly hold that "employees serving a government in 'representative,' 'spokesperson,' or 'liaison' capacities are exempt from First Amendment protection under" *Elrod*, *Branti*, and *Rutan*. *Alberti*, 393 F. Supp. 2d at 169 (collecting cases). The record in this case clearly demonstrates that Plaintiff could, and did, "engage in tasks for which partisan or ideological affiliation likely affects performance." *Id.*

> There is no likely circumstance in which a shared ideology is more important than when an elected official appoints a deputy who may act in his or her stead. Elected officials are charged with carrying forth the mandate of the voting public, and in order to effectuate the policies promised the electorate, that official must be able to have trusted advisors and alternates who are directly accountable to that official.

*Regan*, 984 F.2d at 580. Plaintiff's decision to run for political office, and her active campaigning for that office, made it impossible for her to serve as Sabatino's aide who "act[ed] in his . . . stead" at community meetings. *Id.* Sabatino cannot have felt that Plaintiff was "directly accountable" to him while she was also running for office. *Id.* And because Sabatino could no longer "trust[]" her to represent him and his interests, he terminated her. *Id.* On its face, this rationale for Plaintiff's termination is wholly legitimate and non-discriminatory under the ADA. *See Burkhardt*, 811 F. Supp. 2d at 652 (holding that the "defendants have established a legitimate, non-discriminatory reason for [the] plaintiff's dismissal, namely, her political affiliation").

Plaintiff makes several contentions in response. She argues that "there was no conflict of interest" with Sabatino because "[c]ity [c]ouncilmembers are elected by the people to be transparent[,] not [c]landestine." (Pl.'s 56.1 ¶ 23.) She argues that "there have never been any conflicts of interest with me regarding Mr. Sabatino" because "I support the LGBTQ, the environmental issues, education, stop bullying campaigns, senior services[,] and other human and social issues." (*Id.* ¶ 17.) Plaintiff also argues that Sabatino "is unable to show any real proof of a conflict of interest with me, or to prove the time of day the signatures were witness[ed]. Most signatures are collected after 5:30 PM. After working hours." (Pl.'s Mem. 28.) And Plaintiff denies that she was a member of a political ticket, (Pl.'s 56.1 ¶ 5), and states that she "informed the prospective person preparing to campaign against [Sabatino] that I would not support her," (*id.* ¶ 23).

Each of Plaintiff's statements is irrelevant to the Court's inquiry. Even assuming Plaintiff was not on a political ticket, that Plaintiff was aligned with Sabatino on substantive policy issues, that elected officials should be transparent, that "most" of Plaintiff's campaigning was done after work hours, it is undisputed that Plaintiff ran for political office. (Pl.'s Dep. 50; Def.'s Decl. Ex. G, at 9.) It is also undisputed that Plaintiff actively campaigned for that office by collecting petition signatures for her candidacy. (*See* Def.'s Decl. Ex. H, at 4–39.) And it is undisputed that Plaintiff's candidacy challenged a member of the political caucus led by Sabatino. (*Id.* Ex. G, at 9.) Indeed, Plaintiff's post-termination op-ed squarely acknowledged that she was "fired from [her] position by Councilmember Sabatino last week due to [her] decision to challenge the incumbent, Christopher Johnson, in this year's September primary election for the first district Yonkers City Council." (*Id.* at 15.) It was thus Plaintiff's very candidacy, rather than her affiliation with a political ticket, that caused the core conflict of interest with Sabatino. Put succinctly, Plaintiff's own "partisan activity" led to her termination. *Kaluczky*, 57 F.3d at 208.

Therefore, Defendant has satisfied its burden at step two of *McDonnell Douglas*. Defendant has "produce[d] evidence" that supports a "clear and specific" explanation for Plaintiff's termination, and which, "*taken as true*, would *permit* the conclusion that there was a [legitimate and] nondiscriminatory reason for the adverse action." *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 136 (2d Cir. 2000) (emphasis in original) (internal quotation marks omitted).

### b. Pretext

Under the third step of *McDonnell Douglas*, the burden is on Plaintiff to establish at least a dispute of fact that proves that Defendant's proffered legitimate, nondiscriminatory reason for firing her was pretextual. *See Abrams*, 764 F.3d at 251 ("[T]he final and ultimate burden is on

the plaintiff to establish that the defendant's reason is in fact pretext for unlawful discrimination.").  To sustain her burden, Plaintiff must "produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by [Defendant] were false, and that more likely than not [disability] discrimination was the real reason for the [termination]."  *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir. 1996) (alteration and internal quotation marks omitted); *see also Flieger v. E. Suffolk BOCES*, 693 F. App'x 14, 18 (2d Cir. 2017) (same).  "It is not enough, in other words, to disbelieve [Defendant]; the factfinder must believe . . . [P]laintiff's explanation of intentional discrimination."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 519 (1993) (emphasis omitted).

Plaintiff fails to sustain her burden.  As an initial matter, Plaintiff offers no explanation as to pretext: she nowhere states or implies that her termination was in fact because of a disability.  (*See generally* Pl.'s 56.1; Pl.'s Mem.)  More importantly, the record belies any suggestion of pretext.  Plaintiff's May 25, 2015 email to colleagues — the email that acknowledged her candidacy against Christopher Johnson — states that Sabatino

> is being pressured by Christopher Johnson and some of the Democratic leaders to make me resign from my position or Michael [Sabatino] will fire me.  No one has ever had to or been asked to resign from their jobs . . . EVER!  As far as I know, every American born citizen who is a resident of the city of Yonkers has the right to run for public office without being retaliated against by those who feel threaten[ed].

(Def.'s Decl. Ex. G, at 10.)  That email, sent about two weeks before Plaintiff's termination, demonstrates that Plaintiff understood her job was at risk, *not* because of her medical issues, but because of her political conduct.  Similarly, Sabatino's June 1, 2015 email to Plaintiff, responding to her leave request, states that "compensatory time shall NOT be used for political activities such as petitioning, campaigning, electioneering, and etcetera" and that Plaintiff and Sabatino "have to discuss some alternative options."  (Pl.'s Mem. 93.)  Sabatino's email clearly

23

displays a concern over Plaintiff's political activity; it does not state or imply that Defendant was concerned about, or indifferent to, Plaintiff's medical issues. Nor does Sabatino's June 8, 2015 termination letter mention Plaintiff's medical issues; rather, it explains that Plaintiff's political candidacy, a fact "documented through numerous media and other sources," "create[s] a clear conflict of interest" and makes it impossible to "promot[e] the [O]ffice's agenda as well as that of the Caucus which the Office serves." (Termination Letter.) Finally, Plaintiff's own post-termination op-ed states that Sabatino "terminated me as his legislative aide as of June 9, *because* I decided to run for the first district City Council seat, as I did four years ago[,] against Christopher Johnson." (*Id.* Ex. G, at 15 (emphasis added).) In sum, nothing in the record suggests pretext. *See Burkhardt*, 811 F. Supp. 2d at (holding the plaintiff failed to demonstrate pretext because, inter alia, "the uncontroverted evidence . . . establishes that [the] plaintiff was fired because of her political affiliation").

Therefore, Plaintiff fails to carry her burden at step three of *McDonnell Douglas*. Because Defendant has proffered a legitimate, nondiscriminatory reason for terminating Plaintiff, and because Plaintiff fails to offer admissible evidence showing Defendant's reason was pretextual, the Court concludes that Defendant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The Court therefore grants summary judgment for Defendant on Plaintiff's ADA claim.

### 2. Title VII Claim

Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). To establish a claim of discrimination under Title VII, a

plaintiff must meet the burden of proving that the adverse employment decision was motivated, at least in part, by "an impermissible reason, such as race, ethnic origin, or gender." *Fields v. N.Y. State Office of Mental Retardation & Developmental Disabilities*, 115 F.3d 116, 119 (2d Cir. 1997). Like claims under the ADA, Title VII claims are analyzed under the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas*, 411 U.S. at 802. To establish a prima facie case of discrimination under Title VII, Plaintiff must prove: (1) that she is a member of a class protected under Title VII; (2) that she was performing her job duties satisfactorily; (3) that she experienced an adverse employment action; and (4) that such action occurred under circumstances giving rise to an inference of discrimination. *See Walsh v. N.Y.C. Housing Auth.*, 828 F.3d 70, 75 (2d Cir. 2016).

Defendant contends that Plaintiff fails to allege discrimination on the basis of a category protected under Title VII, (Def.'s Mem. 14–15; Def.'s Reply ¶ 9), namely, "race, color, religion, sex, or national origin," 42 U.S.C. § 2000e-2(a)(1). Defendant is correct. Plaintiff alleges discrimination on the basis of her medical disability, which is not a protected category under Title VII. *See Risco v. McHugh*, 868 F. Supp. 2d 75, 106–07 (S.D.N.Y. 2012) ("Title VII does not prohibit discrimination on the basis of disability."); *Zick v. Waterfront Comm'n of N.Y. Harbor*, No. 11-CV-5093, 2012 WL 4785703, at *7 (S.D.N.Y. Oct. 4, 2012) ("Plaintiff only claims she was discriminated on the basis of her broken leg; disability is not a Title VII protected class. Without alleging membership in a protected class and discrimination on the basis of that membership, Plaintiff cannot state a claim under Title VII, no matter how heinous the conduct alleged."). Plaintiff does not allege discrimination on the basis of her race, color, religion, sex, or national origin. Because Plaintiff makes "no reference whatsoever to discrimination on the basis of" a category protected under Title VII, *Falso v. SPG Direct*, No. 05-CV-6548L, 2008 WL

1946542, at *2 (W.D.N.Y. May 1, 2008), the Court grants summary judgment for Defendant on Plaintiff's Title VII claim.

## III. Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment is granted. The Clerk of the Court is respectfully directed to terminate the pending Motion, (Dkt. No. 63), enter judgment for Defendant, and close this case.

SO ORDERED.

DATED:      December 17, 2018
               White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE